**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRIWAYS, INC. and JUAN MANUEL JAUREGUI,<br><br>Plaintiffs,<br><br>-against-<br><br>QFS CAPITAL, LLC and EVAN SAMLIN,<br><br>Defendants. | Case No.: ______________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Triways, Inc. ("Triways") and Juan Manuel Jauregui ("Jauregui" and, collectively, "Plaintiffs"), by their attorneys, Heskin & Proper, PLLC, allege against Defendants QFS Capital, LLC ("QFS") and Evan Samlin ("Samlin" and, collectively, "Defendants"), upon personal knowledge as to their own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This action concerns a financing transaction that QFS called a sale but enforced as an absolutely repayable loan. QFS promised no present, segregated receivable. It advanced working capital, required fixed daily withdrawals, took blanket liens over every account and deposit account, and asserted a fixed "Current Balance Due" when it wanted payment.

2. The transaction presents a basic property question: can a merchant presently sell the same future receipts, in full, to multiple purported purchasers at the same time? Basic principles of property, logic, and time say no. A merchant cannot convey title to receipts that do not yet exist, and it cannot repeatedly sell the same undifferentiated cash flow as though each buyer received exclusive ownership.

3. QFS's own conduct exposes the fiction. Although its contract claimed that QFS purchased only 23% of Triways's receipts, QFS filed a financing statement covering all

accounts, accounts receivable, and deposit accounts, including after-acquired property. It named not only Triways, but a related company and Jauregui personally as debtors.

4. QFS then deployed that blanket filing against Allen Lund Company, one of Triways's account debtors. QFS demanded that Allen Lund place a hold on Triways's receivables, pay QFS rather than Triways, and accept that payment to anyone else would not discharge the account. QFS threatened that noncompliance would violate the UCC and expose Allen Lund to liability.

5. QFS did not ask Allen Lund to identify and remit 23% of particular receipts. It asserted a fixed "Current Balance Due" of $251,719.05 and attempted to redirect 100% of Triways's account receivable until QFS was paid. That is debt collection, not delivery of a purchased percentage.

6. The economics confirm the same result. Contract No. 5659 stated a Maximum Purchased Amount of $909,713.44, a Maximum Purchase Price of $606,880.22, and a Maximum Net Funded Amount of only $576,536.22 after deductions. QFS thus contracted to extract $333,177.22 above the maximum net funding, before default charges, legal fees, collection costs, and other additions.

7. QFS required $7,985.21 every business day. At that rate, the stated Maximum Purchased Amount would be delivered in approximately 114 business days, or roughly 160 calendar days. Even assuming, conservatively and contrary to QFS's staged-deployment structure, that QFS advanced the entire Maximum Net Funded Amount on the first day and began collections on the next business day, the scheduled cash flows produce a nominal annualized return of approximately 225% and an effective annual yield of approximately 844%.

8. That conservative calculation understates the true cost if QFS funded in installments, delayed any deployment, withheld additional fees, or began collecting before the full purchase price was delivered. The promised return exceeded both New York's 25% criminal-usury ceiling and California's then-applicable 10.5% constitutional ceiling many times over.

9. California law independently condemns the transaction. Triways and Jauregui are California residents; Triways operated and generated its receipts in California; QFS withdrew from a California merchant's designated East West Bank account; QFS filed a California financing statement; and QFS enforced against a California account debtor. California therefore has a materially greater interest in regulating the transaction and protecting its residents from usury.

10. California's usury prohibition is a fundamental, nonwaivable public policy that protects sophisticated commercial borrowers as well as consumers. *G Companies Management, LLC v. LREP Arizona LLC*, 88 Cal. App. 5th 342, 350–54 (2023). QFS's New York choice-of-law clause cannot be used to extinguish California's constitutional protection where California law otherwise governs.

11. New York law looks to substance, not labels. The Appellate Division recently affirmed that merchant-cash-advance agreements are loans where reconciliation is not meaningful in practice, daily payments are fixed, nonpayment or business interruption produces full recourse, and personal guarantees secure collection. *People v. Richmond Capital Group LLC*, 246 A.D.3d 585, 586–87 (1st Dep't 2026).

12. The bankruptcy courts apply the same substance-over-form rule. *In re Anadrill Directional Services Inc.*, 2026 WL 234908, at *4–*7 (Bankr. S.D. Tex. Jan. 28, 2026), held that nominal reconciliation, a finite term, bankruptcy recourse, a blanket lien, and a guaranty plausibly established a loan notwithstanding a "THIS IS NOT A LOAN" legend.

13. *In re IVF Orlando, Inc.*, 2025 WL 2831400, at *7–*11 (Bankr. M.D. Fla. Oct. 3, 2025), further held that a merchant cannot complete a present sale of receipts that do not yet exist. An expectancy dependent on future services is not present property under U.C.C. §§ 9-102 and 9-318; at most, the merchant promises to transfer later-arising receipts.

14. The proof-of-claim process exposes the same contradiction. *O'Toole v. Radium2 Capital, LLC* (*In re J.P.R. Mechanical Inc.*), 2025 Bankr. LEXIS 1319, at *28–*30 (Bankr.

S.D.N.Y. May 30, 2025), treated a funder's sworn proofs of claim as virtually dispositive admissions that it was a creditor owed fixed sums, not the owner of purchased property.

15. QFS has made the same creditor election in bankruptcy courts across the country. QFS filed or caused to be filed proofs of claim in *In re A Grande Promotion Company, LLC*, Case No. 2:24-bk-09458-SHG (Bankr. D. Ariz.); *In re B&W, Inc.*, Case No. 25-42650-ELM-11 (Bankr. N.D. Tex.); and *In re Sitek Productions, Inc.* and *In re Sitek Logistics, Inc.*, Case Nos. 6:22-bk-3141-GER and 6:22-bk-3142-GER (Bankr. M.D. Fla.).

16. In those proceedings QFS sought allowance and payment of fixed monetary obligations from bankruptcy estates. It did not merely seek turnover of specifically identified receipts that it already owned and that were excluded from the estate.

17. QFS's creditor election is consistent with its treatment of Triways and with a separate QFS transaction involving Pet Professionals, Inc. In both matters QFS used a standardized receivables-purchase form, fixed withdrawals, blanket UCC rights, acceleration remedies, account-debtor or processor notices, and demands for payment of a fixed balance.

18. The separate Pet Professionals transaction also demonstrates that QFS's conduct was not an isolated collection decision. When that merchant advised QFS it could not afford fixed withdrawals and sought reconciliation, QFS allegedly refused meaningful relief, froze its card-processor settlements, and conditioned release of its lien on a deal under which QFS would be paid.

19. Samlin owns and controls QFS. Upon information and belief, he established, approved, maintained, and benefited from the standardized origination, reconciliation, default, UCC-enforcement, processor-diversion, and account-debtor collection practices alleged here.

20. Plaintiffs seek a declaration that Contract No. 5659 was a criminally usurious loan and void from inception, cancellation of QFS's UCC claims, restitution and damages, relief for commercially unreasonable collection and interference with Triways's business relations, and civil-RICO remedies for collection of unlawful debt through the QFS enterprise.

## PARTIES

21. Plaintiff Triways is a corporation with its principal place of business at 11201 Iberia Street, Suite B, Jurupa Valley, California 91752. It provides transportation and logistics services and earns receivables from customers and account debtors, including Allen Lund Company.

22. Plaintiff Jauregui is an individual residing in California. He owns Triways and signed Contract No. 5659 for the company.

23. QFS's California financing statement also named Jauregui personally as an additional debtor and purported to encumber all present and after-acquired accounts, accounts receivable, and deposit accounts. Jauregui therefore seeks declaratory and injunctive relief concerning QFS's claims against him and his property.

24. Defendant QFS is a Delaware limited liability company that originates, services, and collects merchant-cash-advance transactions nationwide. Its current Florida filings list a Fort Lauderdale principal address and a St. Petersburg mailing address, and its contract represented that the Triways transaction was made and performed in New York.

25. Public Florida Department of State records identify Samlin as a member of QFS. QFS's 2024 annual report, 2025 reinstatement, and 2026 annual report each list "SAMLIN, EVAN" with the title "MBR."

26. Upon information and belief, Samlin is an owner, managing principal, and senior directing person of QFS. He controls material aspects of QFS's affairs, including transaction approval, underwriting standards, pricing, contract forms, reconciliation policy, funding practices, UCC filings, account-debtor demands, processor restraints, collection procedures, and settlements.

## JURISDICTION AND VENUE

27. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because Plaintiffs assert claims under 18 U.S.C. §§ 1962(c) and (d).

28. This Court has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367 because they arise from the same transaction, enterprise, and collection course of conduct.

29. Personal jurisdiction exists over QFS because QFS selected New York law, represented that the agreement was made and performed in New York, consented to jurisdiction in state and federal courts in New York, directed interstate wire and ACH activity through New York, and invoked New York law and remedies.

30. Personal jurisdiction exists over Samlin under 18 U.S.C. § 1965 and because, upon information and belief, he personally directed, authorized, or ratified QFS's New York-centered origination and collection practices with knowledge of QFS's New York choice-of-law and forum provisions.

31. Venue is proper under 28 U.S.C. § 1391(b) and Contract No. 5659's New York forum provision. The agreement also designated New York County as the location of any requested arbitration.

32. The arbitration language does not defeat subject-matter jurisdiction. Plaintiffs allege that the entire agreement, including its one-sided cost-shifting and remedial restrictions, was part of a criminally usurious transaction void from inception. The clause expressly reserves enforceability issues for a court and was not separately negotiated.

33. California also has substantial and materially greater contacts with the transaction because Plaintiffs reside there, Triways operated and earned the alleged receipts there, the designated bank account served the California business, QFS filed its financing statement there, and QFS directed collection activity at a California account debtor. Plaintiffs plead application of California law and remedies in the alternative to their claims under New York law.

## FACTUAL ALLEGATIONS

34. On or about July 10, 2024, QFS and Triways entered Contract No. 5659, styled a "Merchant Agreement for the Purchase and Sale of Future Receipts."

35. The agreement identified Triways as the sole merchant, Jauregui as its owner and primary contact, and an East West Bank account as the authorized account for deposits and QFS's ACH withdrawals.

36. The agreement stated a Maximum Purchased Amount of $909,713.44, a Maximum Purchase Price of $606,880.22, a Maximum Net Funded Amount of $576,536.22, a Purchased Percentage of 23%, and a fixed daily remittance of $7,985.21.

37. The $30,344 difference between the Maximum Purchase Price and Maximum Net Funded Amount represented origination fees deducted before Triways could use the funds. The contract imposed additional charges for returned items, collection, legal fees, and enforcement expenses.

38. QFS did not promise to deliver the full purchase price at closing. Sections 1 through 3 contemplated multiple "Deployments," conditioned every future deployment on QFS's continuing satisfaction with Triways, and allowed QFS to suspend remaining deployments temporarily or permanently.

39. The staged structure allowed QFS to begin collecting while retaining a material portion of the promised funding. QFS therefore earned a return on money it had not yet advanced, while Triways bore the immediate fixed daily outflow.

40. At $7,985.21 per business day, 113 full remittances and a final remittance of approximately $7,384.71 would deliver $909,713.44 in 114 business days.

41. Assuming the entire $576,536.22 Maximum Net Funded Amount was advanced on July 10, 2024 and the first remittance was taken on the next business day, the finite scheduled term would end on or about December 17, 2024.

42. On those assumptions, which are favorable to QFS, the daily internal rate of return is approximately 0.867%, equivalent to approximately 225% on a 260-business-day nominal annual basis and approximately 844% on an effective annual basis.

43. QFS's actual rate was higher to the extent it delivered funds in stages, deducted fees from each stage, delayed deployments, began collections before all deployments, or collected additional charges.

44. Article XV, section 1 of the California Constitution capped interest on this nonconsumer transaction at the higher of 10% per annum or 5% above the Federal Reserve Bank of San Francisco's prevailing advance rate on the twenty-fifth day of the month preceding the agreement. The applicable Federal Reserve primary-credit rate on June 25, 2024 was 5.5%, producing a maximum California rate of 10.5% per annum.

45. California measures usury by substance and includes fees, bonuses, commissions, discounts, and other compensation paid for the use or forbearance of money. The $30,344 withheld from the stated Maximum Purchase Price, together with the $333,177.22 spread between net funding and required collections and all additional charges, constituted interest for purposes of California law.

46. The approximately 225% nominal annualized rate exceeded California's 10.5% maximum by more than twenty times. The transaction was usurious under California law even on assumptions most favorable to QFS.

47. Upon information and belief, QFS was not a bank, licensed finance lender, real-estate broker, or other person or entity exempt from California's usury restrictions with respect to Contract No. 5659.

48. California's constitutional usury protection cannot be waived. *G Companies Management, LLC v. LREP Arizona LLC*, 88 Cal. App. 5th at 350–54. Courts likewise refuse to enforce contractual choice-of-law provisions used to evade California's strong public policy against usury. *Mencor Enterprises, Inc. v. Hets Equities Corp.*, 190 Cal. App. 3d 432, 440–41 (1987).

49. The agreement displayed the legend "THIS IS NOT A LOAN" while imposing the hallmarks of an absolutely repayable credit transaction.

50. Section 6 described reconciliation as an "IMPORTANT PROTECTION FOR MERCHANT" and stated that QFS would compare fixed remittances with actual revenue during a 30-day review period.

51. But the reconciliation procedure required Triways to request relief, provide whatever information QFS demanded, and await QFS's calculation. QFS controlled both the information standard and the timing and amount of any adjustment.

52. Section 7 purported to shift the risk of business failure to QFS. Sections 9 through 12 then reclaimed that risk through representations, covenants, blanket monitoring rights, acceleration, 100% collection, litigation expenses, and cumulative remedies.

53. Section 9.1 prohibited Triways from entering any later receivables sale, factoring transaction, line of credit, or loan involving receipts without QFS's written consent. The provision protected QFS's priority in Triways's cash flow rather than ownership of a segregated asset.

54. Section 9.2 authorized QFS to demand current and future bank and financial statements. Sections 10.2 through 10.6 authorized QFS to monitor Triways's accounts, contact banks and processors, conduct investigations, and communicate with customers and account debtors.

55. Section 9.6 made the absence of pending or contemplated bankruptcy an express representation. It required Triways to represent that it was not insolvent, had not consulted a bankruptcy attorney during the preceding six months, and did not anticipate a voluntary or involuntary bankruptcy filing.

56. Section 11 made any violation of any term or covenant a trigger for full recourse. QFS could increase its Purchased Percentage to 100%, collect the full undelivered Aggregate Purchased Amount immediately, enforce any purported guaranty, recover all legal and collection expenses, and invoke every available Article 9 remedy.

57. Section 12 provided that QFS's remedies would not be limited by anything QFS knew or could have learned before or after contracting. That clause attempted to preserve QFS's recourse even when its own underwriting disclosed the condition it later called a breach.

58. These provisions created a finite repayment period and complete recourse. Triways bore the risk of declining receipts, insolvency, business interruption, insufficient funds, banking disruption, later financing, inaccurate projections, and nearly every other event affecting repayment.

59. The agreement did not identify any existing account sold to QFS, transfer control of a specific receivable at closing, or permit QFS to use or resell a presently existing asset. Triways remained responsible for operating its business, earning future receipts, collecting customers, and depositing the cash from which QFS would withdraw.

60. QFS therefore received, at most, a promise that Triways would pay from later cash flow. The blanket lien and Article 9 remedies secured that payment promise.

61. Two days after the agreement date, QFS caused California financing statement number UCC1-1395369 to be filed.

62. The filing described QFS's collateral as "All accounts, accounts receivables, and deposit accounts now existing or hereafter acquired or arising, together with all accessions and proceeds related thereto."

63. That collateral description was not limited to 23% of Triways's future receipts or to any identified account. It asserted a blanket lien over 100% of the business's operating assets and bank accounts.

64. The filing named Triways as a debtor, but it also named McKennah Distribution Services Inc. as a second organizational debtor and Jauregui as an additional individual debtor.

65. The QFS contract packet presently available to Plaintiffs identifies Triways as the merchant and does not include a separately executed instrument conveying all assets of McKennah Distribution Services Inc. or Jauregui to QFS.

66. QFS's decision to name a related company and the owner personally as debtors further demonstrates that it sought lender-style collateral and recourse beyond a 23% participation in Triways's receipts.

67. By December 19, 2024, QFS asserted that Triways had a "Current Balance Due" of exactly $251,719.05.

68. On that date QFS chief financial officer Benjamin Hinke sent Allen Lund Company a letter requesting that "a hold be placed" on Triways's account receivable.

69. A second QFS letter informed Allen Lund that Triways had assigned QFS rights to receive payment and instructed Allen Lund "to make payments due on that obligation to us and not to the Merchant."

70. QFS demanded that Allen Lund immediately send the funds to QFS and warned: "Failure to do so is a violation of the UCC and may expose you to liability."

71. QFS further declared: "Payment in any other way will not discharge your obligation."

72. The demand did not identify a particular invoice QFS had purchased, establish that Allen Lund had received reasonable proof of a specific assignment, or calculate 23% of a defined receipt.

73. Instead, QFS asserted a fixed balance, demanded control of 100% of Allen Lund's payment stream, and threatened Allen Lund with non-discharge and liability unless it withheld funds from Triways.

74. The collection letter was therefore inconsistent with QFS's claimed ownership of only a percentage of receipts. It was a garnishment-like demand intended to collect a fixed debt through Triways's customer.

75. QFS's conduct impaired Triways's relationship with Allen Lund, exposed Triways's financial distress to a customer and business counterparty, deprived or threatened to deprive Triways of operating cash, and interfered with the revenue needed for payroll, taxes, equipment, vendors, and ordinary operations.

76. QFS knew that diverting a transportation company's customer payments could prevent it from paying drivers, employees, fuel, equipment, taxes, and other operating costs and could destroy the enterprise that generated the purported receipts.

77. QFS nevertheless selected the most coercive remedy available: a blanket hold and 100% redirection demand that bore no relation to the contract's 23% Purchased Percentage.

78. By March 2026, Triways was under severe pressure from multiple MCA funders making fixed daily withdrawals. After Triways blocked withdrawals, funders who had refused relief began asking for payment plans.

79. In a contemporaneous email, Jackie Lopez identified QFS among the "older" lenders whose "old money" Plaintiffs' counsel might pursue. That ordinary description reflected the economic reality: QFS had advanced money and was collecting old money, not taking delivery of property it already owned.

80. The later MCA agreements in Triways's records also show the practical impossibility of the industry's repeated-sale fiction. Horizon Capital, Sinclair Funding, Square Funding Cali, Nitro, and Speedy Funding each documented later transactions as purported purchases or advances against the same general category of Triways's future revenue.

81. Those later transactions do not excuse any contractual breach. They demonstrate that the subject of QFS's supposed sale was not a presently existing, segregated res that QFS possessed and controlled. The asset remained Triways's future business activity and undifferentiated cash flow.

82. The same future earnings could not be fully owned by multiple funders at the same time. Each funder's use of UCC filings, fixed withdrawals, acceleration, and account-debtor demands shows that the transactions functioned as competing credit claims against Triways's revenue.

83. QFS's collection practices were not unique to Triways. QFS used materially similar standardized terms and remedies in Contract No. 8978 with Pet Professionals, Inc. in January 2026.

84. That agreement stated a Maximum Purchased Amount of $643,645.30, a Maximum Purchase Price of $429,383.17, a Maximum Net Funded Amount of $407,913.95, a Purchased Percentage of 29%, and a fixed weekly remittance of $13,578.25.

85. QFS scheduled the Pet Professionals funding in 27 staged deployments over approximately six months while requiring fixed remittances during the deployment period. On the face of the schedule, the conservative annualized internal rate of return was approximately 259%, with an effective annual yield exceeding 1,100%.

86. Before QFS funded Pet Professionals, other MCA providers were already making recurring withdrawals from the same operating account and claiming interests in the same future cash flow.

87. QFS had contractual access to Pet Professionals's bank statements and conditioned later deployments on updated records. It therefore knew, or deliberately avoided confirming, that competing funders were collecting from the same account.

88. When Pet Professionals sought reconciliation in July 2026, QFS servicing personnel allegedly counted all deposits, including owner contributions and third-party loan proceeds, as "receipts," while excluding QFS's own staged funding from the same calculation.

89. QFS further imposed an underwriting-baseline condition absent from the written reconciliation clause and continued fixed withdrawals despite the merchant's changed financial condition.

90. Pet Professionals's records alleged that QFS deployed $407,913.95 and collected $385,622.30 through August 19, 2026, while attempting additional withdrawals that were returned unpaid.

91. After collections stopped, QFS allegedly escalated the account, invoked Section 11 and its blanket UCC rights, described the obligation as a fixed debt, discussed a payment plan and "full payoff," and identified a "last payment" date.

92. On September 9, 2026, QFS sent Pet Professionals's card processor, Payroc LLC, a direct-payment demand instructing the processor to stop payments to the merchant and redirect all current and future processor settlements to QFS.

93. The Payroc demand did not request 29% of identified receipts. It attempted to seize 100% of processor revenue and threatened that payments made elsewhere would not discharge the processor's obligation and could create double liability.

94. The next day QFS collections personnel allegedly stated that QFS would release its UCC lien only after the parties reached a deal and QFS was "paid."

95. The processor restraint deprived Pet Professionals of operating cash, prevented or threatened payroll, impaired financing and sales, and placed the business at risk of closure. It also destroyed the very revenue stream QFS claimed to have purchased.

96. The parallels are material. In both transactions QFS used a standardized sale label, withheld fees, imposed fixed remittances over a finite horizon, took blanket collateral, reserved 100% collection and acceleration, and used UCC notices to intercept operating revenue until a fixed balance was paid.

97. QFS's bankruptcy practice confirms the same systemic treatment. In the A Grande bankruptcy, QFS appeared as the holder of Claim Nos. 6-1 and 7-1 for fixed monetary amounts of $15,589.60 and $129,117.41.

98. In the B&W bankruptcy, the debtor's plan identified QFS as holding an asserted secured claim of approximately $177,974.15 based on a merchant agreement and provided for treatment through the claims process.

99. In the jointly administered Sitek bankruptcies, QFS filed Claim No. 7 for approximately $69,705.70 as an unsecured claim.

100. A proof of claim is a demand for payment by a creditor holding a claim against the debtor or estate. The signer certifies accuracy under penalty of perjury and identifies the current creditor, the amount owed, and the basis of the debt.

101. QFS did not use those bankruptcy cases solely to recover property it already owned. It sought allowance and distribution as a creditor for a fixed balance.

102. QFS's agreements also treat bankruptcy as a recourse event in substance. They make the absence of contemplated bankruptcy a continuing representation and authorize acceleration, 100% collection, guaranty enforcement, and expenses when a representation or covenant is breached.

103. Bankruptcy therefore functions as the practical equivalent of default and triggers full recourse, rather than leaving QFS to bear the risk that future receipts may never arise.

104. QFS's sworn creditor position and bankruptcy enforcement are consistent with its conduct toward Triways: QFS advanced money, monitored credit risk, collected fixed payments, asserted a fixed balance, took blanket collateral, and threatened account debtors until it was paid.

105. The Florida Department of State filings identify Samlin as a member of QFS throughout the period of the Triways and Pet Professionals transactions.

106. Upon information and belief, Samlin exercised ultimate authority over QFS's origination and collection business and had final decision-making power over material policies governing underwriting, pricing, deployment schedules, reconciliation, defaults, UCC filings, account-debtor notices, processor diversions, payoff demands, and settlements.

107. Samlin created, approved, implemented, maintained, or ratified the standardized forms and policies used to characterize fixed obligations as purchases, automate withdrawals, frustrate or condition reconciliation, secure blanket collateral, accelerate balances, and divert customer or processor payments.

108. Samlin selected, authorized, supervised, and directed QFS personnel who performed underwriting, funding, servicing, reconciliation, default escalation, and collection. Their actions were taken within the authority and policies he established.

109. Samlin's participation was managerial and operational, not passive ownership or the provision of ordinary professional services. He received the direct financial benefit of QFS's fees, remittances, default charges, payoff proceeds, and recoveries.

110. QFS, Samlin, QFS's brokers, funding personnel, servicing employees, collection employees, payment providers, and collection service providers formed an association-in-fact enterprise (the "QFS Collection Enterprise").

111. The QFS Collection Enterprise had the common purpose of soliciting merchants needing working capital, documenting advances as purchases of future receipts, imposing fixed remittances and lender-style recourse, frustrating meaningful contingency, and collecting the obligations as absolute debts.

112. The enterprise had relationships among its participants, an ongoing command structure, and sufficient longevity to solicit merchants, obtain banking data, underwrite and approve transactions, generate standardized agreements, deploy funds, process ACH withdrawals, administer reconciliation, declare defaults, file liens, notify processors and account debtors, and demand fixed payoffs.

113. QFS functioned as the enterprise's funding, documentation, servicing, and enforcement arm. Samlin directed and controlled QFS. Brokers and funding participants solicited and packaged merchants. Servicing personnel administered withdrawals and purported reconciliation. Collection personnel and providers enforced defaults, UCC claims, processor restraints, account-debtor diversions, and payoff demands.

114. The participants shared financial incentives in successful origination and collection, including deductions, fees, commissions, fixed remittances, default charges, legal charges, and payoff proceeds.

115. The QFS Collection Enterprise is distinct from each Defendant and affected interstate commerce through emails, telephone communications, electronic signatures, wire transfers, ACH debits, interstate banks and processors, UCC filings, bankruptcy claims, and account-debtor notices.

116. The Triways obligation was an "unlawful debt" under 18 U.S.C. § 1961(6) because it arose from QFS's business of lending money in substance, was unenforceable in

whole or in part under New York and California usury law, and carried interest and charges exceeding twice the maximum enforceable rate under either State's law.

117. QFS and Samlin knew the features that made the obligation an unlawful debt: the funding was less than the fixed amount to be collected; the payments and term were finite; reconciliation was controlled by QFS; blanket liens and 100% collection secured performance; QFS retained recourse; and QFS collected through debt terminology and remedies.

118. Defendants conducted and participated in the enterprise's affairs through the collection and attempted collection of that unlawful debt and materially similar unlawful debts, including the Pet Professionals obligation.

119. Plaintiffs suffered injury to business and property through deductions and fixed payments to QFS, loss of use of operating funds, the blanket liens, impaired customer and banking relationships, threatened or actual diversion of receivables, business interruption, costs incurred responding to QFS's collection, and other damages to be proven at trial.

## FIRST CAUSE OF ACTION

## DECLARATORY JUDGMENT, RESCISSION, AND CANCELLATION

**(Against All Defendants)**

120. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

121. An actual controversy exists concerning whether Contract No. 5659 was a true sale of present property or instead a loan; whether it violates New York and California usury law; whether it is criminally usurious and void under New York law; whether its interest provisions are void under California law; whether QFS may retain payments; and whether QFS may enforce any ACH authorization, lien, account-debtor notice, alleged guaranty, arbitration clause, or asserted balance.

122. No completed sale occurred because the unidentified future receipts did not exist when the agreement was executed, Triways retained the responsibility and risk of generating and collecting every receipt, and QFS never obtained possession or control of a segregated asset.

123. The transaction was a loan because repayment was absolute in practice, the remittance and term were finite, reconciliation did not meaningfully transfer risk, and QFS retained complete recourse through blanket collateral, 100% collection, acceleration, fees, and account-debtor enforcement.

124. The annualized rate exceeded 25%. A corporation may assert criminal usury, N.Y. Gen. Oblig. Law § 5-521(3), and a criminally usurious loan is void ab initio. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 332–33 (2021).

125. Plaintiffs are entitled to a declaration that the agreement is void, cancellation of all UCC filings and asserted liens, withdrawal of account-debtor demands, restitution of amounts unlawfully received, and relief against further collection.

**SECOND CAUSE OF ACTION**

**DECLARATORY RELIEF AND REMEDIES FOR CALIFORNIA USURY**

**(Cal. Const., art. XV, § 1; Cal. Civ. Code §§ 1916-2 and 1916-3; Against All Defendants)**

126. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

127. This claim is pleaded in the alternative to Plaintiffs' New York usury claim and applies to the extent California law governs the transaction, its performance, or QFS's enforcement conduct.

128. Contract No. 5659 was, in substance, a loan or forbearance of money. QFS advanced capital and required repayment of a fixed amount over a finite term, while retaining complete recourse through blanket collateral, acceleration, fees, and account-debtor enforcement.

129. The maximum lawful California rate was 10.5% per annum when the agreement was made. QFS contracted for an approximately 225% nominal annualized return, exclusive of additional default and enforcement charges, and therefore violated article XV, section 1 of the California Constitution.

130. Upon information and belief, QFS was not exempt from California's usury restrictions with respect to this transaction.

131. California has a materially greater interest in the transaction because Plaintiffs are California residents, Triways operated and generated the alleged receipts there, QFS filed a California financing statement, and QFS enforced against a California account debtor. California's usury prohibition is fundamental and nonwaivable. *G Companies Management, LLC v. LREP Arizona LLC*, 88 Cal. App. 5th 342, 350–54 (2023).

132. California Civil Code § 1916-2 renders the usurious interest stipulation null and void and bars QFS from recovering interest. California Civil Code § 1916-3 permits recovery of treble the usurious interest paid to the extent timely and otherwise recoverable.

133. Plaintiffs are entitled to declaratory and injunctive relief, restitution, statutory damages, treble recovery of unlawful interest where authorized, and all other relief available under California law.

## **THIRD CAUSE OF ACTION**

## **CIVIL RICO — COLLECTION OF UNLAWFUL DEBT**

**(18 U.S.C. § 1962(c); Against All Defendants)**

134. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

135. QFS and Samlin are persons within the meaning of 18 U.S.C. § 1961(3).

136. For the reasons alleged above, QFS is an enterprise within the meaning of 18 U.S.C. § 1961(4) and is legally distinct from Samlin, the natural person who owns, directs, and operates it.

137. Alternatively, QFS, Samlin, QFS's brokers, funding participants, payment and ACH providers, servicing personnel, collection employees, and collection agents formed the QFS Collection Enterprise, an association-in-fact enterprise within 18 U.S.C. § 1961(4).

138. The QFS Collection Enterprise had a common purpose, relationships among its participants, an ongoing command structure, and longevity sufficient to originate, fund, document, service, and collect merchant obligations represented as receivables purchases.

139. Samlin directed and controlled the enterprise's affairs through ownership, final policy authority, selection and supervision of personnel, approval and maintenance of contract and collection systems, delegation, and ratification.

140. QFS participated in the enterprise's affairs by underwriting and funding transactions, supplying forms and authorizations, processing withdrawals, administering reconciliation, asserting defaults and liens, and directing processors and account debtors to divert merchant revenue.

141. The Triways obligation was unlawful debt within 18 U.S.C. § 1961(6) because it arose from the enterprise's business of lending money, was unenforceable in whole or in part under New York and California usury law, and carried a rate exceeding twice the maximum enforceable rate under either State's law.

142. Defendants knowingly collected and attempted to collect the unlawful debt through interstate wires, ACH debits, fixed remittances, blanket UCC filings, acceleration, fees, threats to an account debtor, and demands that Triways's customer remit 100% of payment to QFS.

143. Defendants' materially similar treatment of Pet Professionals, QFS's repeated proofs of claim as a creditor, and QFS's standardized forms and remedies demonstrate that the collection of Triways's unlawful debt was part of the enterprise's regular way of doing business.

144. As a direct and proximate result, Plaintiffs suffered injury to business and property, including unlawful charges and payments, impaired receivables and customer relationships, loss of use of operating funds, costs of responding to collection, business interruption, and other consequential loss. Triways is entitled to treble damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**FOURTH CAUSE OF ACTION**

**RICO CONSPIRACY**

**(18 U.S.C. § 1962(d); Against All Defendants)**

145. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

146. QFS and Samlin knowingly agreed that a conspirator would conduct or participate in the affairs of QFS and the QFS Collection Enterprise through the collection of unlawful debt, and each knowingly joined and participated in that agreement.

147. Samlin's agreement is shown by his ownership and executive control, authority over every material stage of QFS's funding and collection business, creation and approval of the policies and instruments used to characterize and collect the obligations, supervision of QFS personnel, and direct financial interest in the proceeds.

148. Samlin authorized or caused enterprise participants to perform complementary functions in solicitation, underwriting, documentation, funding, ACH processing, reconciliation, default escalation, UCC enforcement, account-debtor and processor diversion, payoff demands, and settlement.

149. Acts in furtherance of the conspiracy included funding Contract No. 5659, taking fixed daily remittances and fees, filing blanket liens against Triways and Jauregui, declaring a fixed balance, threatening Allen Lund with liability, and demanding that it withhold and redirect Triways's receivables.

150. Plaintiffs were injured in their business and property by acts undertaken in furtherance of the conspiracy and are entitled to relief under 18 U.S.C. § 1964(c).

**FIFTH CAUSE OF ACTION**

**FRAUDULENT INDUCEMENT**

**(Against QFS)**

151. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

152. QFS represented that it was purchasing future receipts, that the transaction was not a loan, that the fixed remittance was merely an estimate of 23% of receipts, that reconciliation would conform collections to actual revenue, and that QFS bore the risk of business failure.

153. Those statements concerned the present structure of QFS's product and its existing servicing and collection policy. They were false because QFS intended to collect a fixed amount over a finite period, retain blanket recourse, accelerate the obligation, increase collection to 100%, and use liens and account-debtor demands to obtain payment regardless of the level of receipts.

154. QFS knew the statements were false or made them recklessly to evade New York and California usury law and induce Triways and Jauregui to sign the agreement, provide banking access, accept fixed withdrawals, and allow QFS to file liens.

155. The misrepresentations were material, and Plaintiffs reasonably relied on the stated contingent-purchase structure and reconciliation protection when entering the transaction.

156. Plaintiffs were injured by QFS's deductions, fixed collections, asserted balance, blanket liens, and interference with Allen Lund and Triways's receivables. QFS's intentional and morally culpable conduct warrants compensatory and punitive damages.

## SIXTH CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

**(Against All Defendants)**

157. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

158. Triways had an existing and prospective business relationship with Allen Lund, which owed or would owe payments to Triways for transportation or logistics services.

159. Defendants knew of that relationship through Triways's underwriting information, account records, customer information, and QFS's collection investigation.

160. Defendants intentionally sent or authorized the December 19, 2024 hold and direct-payment demands to coerce payment of a disputed and unlawful debt, not merely to collect a 23% interest in an identified receivable.

161. Defendants used wrongful means by asserting ownership and lien rights derived from a void criminally usurious transaction, demanding 100% of Allen Lund's payments, threatening non-discharge and liability, and exposing Triways's alleged default and financial condition to its customer.

162. The interference caused withholding or threatened withholding of receivables, impaired Triways's customer relationship and reputation, deprived it of the use of operating funds, and caused consequential damages to be proven at trial.

## SEVENTH CAUSE OF ACTION

## DECLARATORY AND INJUNCTIVE RELIEF CONCERNING UCC CLAIMS

**(Against All Defendants)**

163. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

164. QFS asserted a blanket security interest in all accounts, accounts receivable, and deposit accounts of Triways, McKennah Distribution Services Inc., and Jauregui, including after-acquired property.

165. QFS then demanded that Allen Lund place a hold on Triways's receivable, pay QFS rather than Triways, and treat other payment as non-discharging and potentially actionable.

166. Because the underlying agreement is void and no present sale of later-arising receipts occurred, QFS has no enforceable ownership right, security interest, or authority to freeze or redirect Triways's receivables or encumber Jauregui's property.

167. Alternatively, a secured party that notifies an account debtor must seasonably furnish reasonable proof of assignment upon request and may collect only within the rights actually assigned. QFS's blanket demand for 100% of payment exceeded the stated 23%

Purchased Percentage and relied on a disputed fixed balance rather than a proven assignment of identified invoices.

168. Plaintiffs face continuing harm from a public lien and collection demands that impair credit, banking, customer relations, and access to operating cash. Those injuries cannot be fully repaired by a later damages award.

169. Plaintiffs are entitled to a declaration that QFS's lien and ownership claims are invalid, termination and withdrawal of the financing statements and notices, and temporary, preliminary, and permanent relief against further diversion or interference.

## EIGHTH CAUSE OF ACTION

## MONEY HAD AND RECEIVED / UNJUST ENRICHMENT

**(Against QFS; Pleaded in the Alternative)**

170. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

171. QFS received origination fees, fixed remittances, charges, or other payments from Triways under a transaction that was void, unlawful, and unenforceable. The exact amount is within QFS's books and will be established in discovery.

172. QFS was enriched at Plaintiffs' expense, and equity and good conscience require restitution of all unlawful interest, fees, charges, diverted receivables, and other sums to which QFS was not entitled.

173. This claim is pleaded in the alternative to the extent no valid contract governs the parties' relationship.

## NINTH CAUSE OF ACTION

## COMMERCIALLY UNREASONABLE UCC ENFORCEMENT

**(N.Y. U.C.C. §§ 9-607(c) and 9-625; Against QFS)**

174. Plaintiffs repeat and reallege every preceding paragraph as if fully set forth here.

175. QFS invoked Article 9 as a purported secured party, asserted that Allen Lund was an account debtor obligated on its collateral, and used a direct-payment demand under U.C.C. § 9-406 to collect and enforce Triways's alleged payment rights.

176. New York U.C.C. § 9-607(c) requires a secured party to proceed in a commercially reasonable manner when it undertakes to collect from or enforce an obligation of an account debtor and retains full or limited recourse against the debtor or a secondary obligor. California Commercial Code § 9607(c) imposes the same duty.

177. QFS retained complete recourse. Contract No. 5659 permitted QFS to increase its Purchased Percentage to 100%, declare the full undelivered Aggregate Purchased Amount and fees immediately due, enforce any guaranty, recover enforcement expenses, and invoke cumulative remedies.

178. QFS did not proceed in a commercially reasonable manner. It demanded a blanket hold, asserted a fixed balance, sought 100% of Allen Lund's payments rather than 23% of identified receipts, threatened non-discharge and liability, and publicly leveraged a disputed lien against Triways's customer.

179. QFS knew its chosen method could deprive Triways of cash needed for drivers, payroll, fuel, equipment, taxes, vendors, and continued operations, impair the alleged collateral, and cause harm grossly disproportionate to collection of any identified account.

180. Under New York U.C.C. § 9-625(a) and (b), and alternatively California Commercial Code § 9625(a) and (b), the Court may restrain noncompliant collection and QFS is liable for every loss caused by its failure to comply with Article 9.

181. Plaintiffs are entitled to actual, consequential, and other recoverable damages, together with temporary, preliminary, and permanent relief requiring QFS to withdraw its Allen Lund demand and terminate related UCC claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment granting the following relief:

i. Declaring Contract No. 5659 a criminally usurious loan under New York law, void ab initio and unenforceable, with no balance due;

ii. Alternatively, declaring that Contract No. 5659 violates article XV, section 1 of the California Constitution, that its usurious interest stipulations are null and void under California Civil Code § 1916-2, and that QFS may not recover interest;

iii. Awarding Plaintiffs restitution and all statutory remedies available under California law, including treble recovery of usurious interest paid to the extent authorized by California Civil Code § 1916-3;

iv. Declaring any guaranty, ACH authorization, arbitration provision, UCC filing, ownership claim, security interest, and account-debtor notice arising from Contract No. 5659 void and unenforceable;

v. Temporarily, preliminarily, and permanently enjoining Defendants from enforcing the Allen Lund demand, redirecting Triways's receipts, issuing further account-debtor notices, or interfering with Plaintiffs' banking, customers, and payment streams;

vi. Ordering Defendants to terminate all UCC filings against Plaintiffs and related entities, withdraw all notices and direct-payment demands, notify Allen Lund and all other recipients that the demands are withdrawn, and cease collection of the asserted obligation;

vii. Awarding Plaintiffs all damages caused by QFS's commercially unreasonable UCC enforcement under New York U.C.C. § 9-625 and California Commercial Code § 9625, including losses from withheld or diverted receivables, impaired customer and banking relations, business interruption, lost use of funds, and costs incurred responding to collection;

viii. Awarding Triways treble damages under 18 U.S.C. § 1964(c), together with costs and reasonable attorneys' fees;

ix. Awarding Plaintiffs rescission, restitution, compensatory, consequential, and punitive damages;

x. Awarding pre- and post-judgment interest as permitted by law; and

xi. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: October 2, 2026
New York, New York

**HESKIN & PROPER, PLLC**

*By: /s/ Shane R. Heskin*
641 Lexington Avenue, 14th Floor
New York, NY 10022 | 917-362-1313
shane@heskinproper.com |
Counsel for Plaintiffs